**Government Exhibit 1**

Linklaters

Linklaters LLP
601 13th Street NW
Suite 400 South
Washington, D.C. 20005
Telephone (+1) 202 654 9227
adam.lurie@linklaters.com

Aaron S.J. Zelinsky
Assistant U.S. Attorney
Office of the U.S. Attorney
District of Maryland
36 South Charles Street
Baltimore, MD 21201

Lauren Archer
Christopher Fenton
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20530

**By Email** March 15, 2024

**Re:** ***United States of America v. Nader Pourhassan and Kazem Kazempour*, Case No. 8:22-cr-440**

Dear Counsel:

Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i), and in accordance with Judge Xinis's Amended Scheduling Order dated January 23, 2024 (ECF No. 94), defendant Dr. Nader Pourhassan hereby discloses that he may call Carl Seiden, Jonathan Macey, Professor David Denis, and Dr. Mark Robbins as expert witnesses at trial, and identifies and provides "a complete statement of all opinions" that Dr. Pourhassan intends to elicit in his case-in-chief, if the defense presents a case, "the bases and reasons for them," the witnesses' qualifications, including a list of all publications authored in the previous 10 years, if any, and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," if any. Fed. R. Crim. P. 16(b)(1)(C)(iii).

Despite this disclosure, Dr. Pourhassan reserves his right not to put on any defense case-in-chief, and not to call any of the witnesses discussed herein. Further, he reserves his right to designate additional expert witnesses and opinions as his trial strategy continues to evolve, including, if it is otherwise appropriate, as necessary for rebuttal.

## 1 Carl Seiden

Mr. Seiden may be called to testify as an expert witness.

This communication is confidential and may be privileged or otherwise protected by work product immunity.

Linklaters LLP is a limited liability partnership registered in England and Wales with registered number OC326345. It is a law firm authorised and regulated by the Solicitors Regulation Authority. The term partner in relation to Linklaters LLP is used to refer to a member of Linklaters LLP or an employee or consultant of Linklaters LLP or any of its affiliated firms or entities with equivalent standing and qualifications. A list of the names of the members of Linklaters LLP together with a list of those non-members who are designated as partners and their professional qualifications is open to inspection at its registered office, One Silk Street, London EC2Y 8HQ or on www.linklaters.com and such persons are either solicitors, registered foreign lawyers or European lawyers.

Please refer to www.linklaters.com/regulation for important information on Linklaters LLP's regulatory position.

Mr. Seiden will provide opinions regarding reasonable investors in single product, pre-commercial biopharmaceutical companies like CytoDyn, including with respect to the sources of information a reasonable investor in such space would consider important when making investment decisions and how a reasonable investor would weigh the total mix of information in the market when making such decisions. In evaluating and providing opinions on reasonable investors in single product, pre-commercial biopharmaceutical companies, Mr. Seiden will use his extensive expertise in advising on investment decision-making in the biopharmaceutical industry, his familiarity with relevant economic literature, and discovery in this case.

Mr. Seiden's *curriculum vitae*, which outlines his qualifications, including a list of all other cases in which, during the previous 4 years, he testified as an expert at trial or by deposition, is attached as **Annex A**. As Mr. Seiden's *curriculum vitae* demonstrates, he has over 30 years of experience both advising biopharmaceutical companies and providing investment analysis to investors in the biopharmaceutical industry. He has substantial experience with, and understanding of, the decision-making process employed by biopharmaceutical investors, including the sources of information used to inform their investment decisions and the knowledge and skills they apply to make those decisions. He has provided expert analysis and testimony in pharmaceutical industry litigation, in which capacity he conducted analyses on the kinds of information and alleged false statements at issue in this case, and analyzed the sorts of information that would be important to a reasonable investor in that given scenario.

We anticipate that Mr. Seiden will provide the following opinions, in substance and context, to help the jury understand the evidence and to determine facts at issue:

1. A reasonable investor in single product, pre-commercial biopharmaceutical companies does not decide to buy, sell, or hold any company's securities based solely on the statements of that company's Chief Executive Officer (CEO). Instead, a reasonable investor decides to buy, sell, or hold a company's securities based on a host of publicly available information. For a single product, pre-commercial biopharmaceutical company, a reasonable investor would consider information regarding the potential clinical profile of the drug candidate, and the resulting likelihood of earning regulatory approval.

2. Instead, a reasonable investor would consider the following types and sources of information to inform such an investment decision: (i) pre-clinical and clinical data, (ii) regulatory requirements for approval, (iii) statements and consultation with the regulatory agency or regulatory consultants, and (iv) related media reports and statements by and in consultation with other interested investors and analysts.

3. A reasonable investor knows and accepts that CEOs generally make statements which are presented in an optimistic and favorable light relative to their company. This is particularly understood by reasonable investors in single product, pre-commercial biopharmaceutical companies, which would likely need to rely on raising capital from investors for financing purposes until they are commercially viable. Thus, a reasonable investor would question—and seek to verify—the statements of such CEOs before deciding whether to buy, sell, or hold the company's securities.

4. A reasonable investor who invests in single product, pre-commercial biopharmaceutical companies, knows and accepts that such an investment is extremely high risk, with a high likelihood of suffering investment losses offset by the potential for outsized gains if the single product succeeds.

5. A reasonable investor knows and accepts that among the greatest risks of investing in single product, pre-commercial biopharmaceutical companies is the failure to achieve regulatory approval for that single product. A reasonable investor who invests in pre-commercial biopharmaceutical

companies knows and accepts that such companies will likely suffer setbacks, whether because of mixed or even negative clinical trial results, or concerns from regulatory authorities like the U.S. Food and Drug Administration (FDA).

6. A reasonable investor in biopharmaceutical companies knows and accepts that regulatory agencies, in this case the FDA, control whether a particular drug candidate can advance through every stage of development and commercialization based on its evaluation of the risk and benefit profile of the drug candidate at each stage.

Mr. Seiden's bases and reasons for these opinions include the following:

1. The case materials that Mr. Seiden considered that were produced by the Government.

2. Mr. Seiden has over 30 years of experience working with and for biopharmaceutical company investors. Mr. Seiden is an expert regarding the process by which a reasonable investor invests and monitors investments in biopharmaceutical companies.

3. Mr. Seiden is the founder and president of Seiden Pharmaceutical Strategies, LLC, which primarily provides business strategy consulting services to biopharmaceutical companies and investment banks, as well as investment analysis to investors. From 1992 to 2006, Mr. Seiden was employed as a pharmaceutical industry equity analyst by Sanford C. Bernstein & Company (1992-1997), JPMorgan Equity Research (1997-2004), and UBS Securities (2004-2006).

4. During his 14 years as an equity research analyst, Mr. Seiden authored more than 800 reports on pharmaceutical companies including Bristol-Myers Squibb, Eli Lilly, Merck, Pfizer, AstraZeneca, and Shire. Most typically, these reports involved a characterization of the investment outlook for the stock.

5. Mr. Seiden's work as an equity research analyst has been recognized by numerous mass media and financial industry publications and services, including the *Wall Street Journal*, the *New York Times*, *Financial Times*, *Fortune*, *Forbes*, and *Business Week*. Moreover, during his career as an equity research analyst, Mr. Seiden was frequently interviewed and cited by print media and appeared as a frequent guest on business television.

6. Mr. Seiden earned a Master of Business Administration degree from The Wharton School at the University of Pennsylvania and a Bachelor of Science degree in biology from Union College. Mr. Seiden has also provided expert testimony and consulting in litigation pertaining to biopharmaceutical companies and biopharmaceutical investing.

## 2 Jonathan R. Macey

Mr. Macey may be called to testify as an expert witness.

Mr. Macey will provide opinions regarding corporate governance principles and practices in public companies generally, and CytoDyn specifically, as well as the ordinary and customary practices followed by public companies when making public communications, as well as the specific practices followed at CytoDyn when issuing press releases and other public communications. In evaluating and providing opinions on corporate governance principles and practices, Mr. Macey will rely on his many years of expertise in evaluating corporate governance, discovery produced in this case, and publicly available information.

Mr. Macey's *curriculum vitae*, which outlines his qualifications, including a list of all other cases in which, during the previous 4 years, he testified as an expert at trial or by deposition, as well as a list of all his publications authored in the previous 10 years, is attached as **Annex B**. As Mr. Macey's *curriculum*

Linklaters

*vitae* demonstrates, he has over 30 years of experience in the area of corporate governance. He has provided expert analysis and deposition and trial testimony in over 20 litigation matters and arbitrations since 2019, in which capacity he has conducted analyses of corporate governance, corporate finance, and corporate control, and has opined on the ordinary and customary business practices between and among parents and subsidiaries, the economic implications of corporate control and limited liability, and the principles and practices underlying the legal concept of alter ego and piercing the corporate veil.

We anticipate that Mr. Macey will provide the following opinions and context to help the jury understand the evidence and to determine facts at issue with respect to the time period relevant to the Indictment:

1. The CEO of CytoDyn serves under the supervision of the Board of Directors, which exercises control and authority over the CEO. Specifically, under Article III, Section 6 of CytoDyn's Bylaws, "the Board of Directors may remove any officer with or without cause by the affirmative vote of a majority of the directors then in office."

2. The CEO of a Delaware-incorporated public company generally may not unilaterally dismiss board members. Consistent with this well-accepted principle, Dr. Pourhassan could not unilaterally dismiss CytoDyn board members because CytoDyn's Bylaws make clear that dismissal of CytoDyn board members must be approved by a majority of shareholders entitled to vote at an election of directors. *See* CytoDyn Bylaws Article II, Section 5 ("Directors may be removed from office only in the manner provided in the Certificate."); and the CytoDyn Certificate of Incorporation, Article VI, Section 5 ("[A]ny Director … may be removed from office (i) only with cause and (ii) only by the affirmative vote of the holders of at least a majority in voting power of the shares then entitled to vote at an election of Directors.")

3. As a Delaware corporation, and consistent with well-known Delaware law, CytoDyn was under the management and control of its Board of Directors. Dr. Pourhassan's ability to direct the actions taken by CytoDyn was appropriately limited by statute, by CytoDyn's Bylaws and Certificate of Incorporation, and by shareholders themselves, who were able to review Dr. Pourhassan's performance by monitoring CytoDyn public statements and observing its share price performance.

4. Public statements, including press releases, SEC filings, investor call scripts and agendas, are typically scrutinized by numerous reviewers before release, including reviewers in legal functions, and evidence indicates this took place at CytoDyn. When publicly traded companies like CytoDyn, or their agents, make public statements—whether in SEC filings, press releases, investor calls or through other channels—it is common and appropriate for them to inform investors regarding the existence of forward-looking statements, opinions, and other caveats, and also to inform investors of the risk factors associated with investing in the company.

5. Dr. Pourhassan did not unilaterally publish company press releases or public statements. Indeed, the evidence indicates that various medical, clinical, pharmacological, legal, and other professionals were involved in the review, issuance, and/or approval of such documents and statements.

6. CytoDyn's Bylaws governed the award and exercising of warrants by corporate officers such as Dr. Pourhassan. The Board of Directors, among others, exercised oversight and control over how and when warrants could be exercised. Here, the evidence indicates that Dr. Pourhassan notified the Board in advance of his exercise of warrants and sale of shares and the Chairman of the Board exercised warrants and sold shares during the same window as Dr. Pourhassan. Dr. Pourhassan's sales of shares were disclosed to the Board of Directors and effected through in-house legal counsel. This conduct is consistent with well-accepted principles and practices of good corporate governance.

Mr. Macey's bases and reasons for these opinions include the following:

1. The case materials that Mr. Macey considered that were produced by the Government.
2. Prior public statements and filings of CytoDyn.
3. Relevant publicly available data and information.
4. Mr. Macey's 30 years of experience as a scholar of corporate governance, including dozens of publications on the subject; years of teaching at American law schools such as Yale University, Harvard University, University of Chicago, Cornell University, University of Virginia, and Emory University; and his roles on the editorial boards of the *Journal of Accounting*, *Finance and Law*, the *Journal of Banking and Finance*, the *Journal of Banking Law*, and the *Journal of Financial Crime*.

## 3 David J. Denis

Professor David J. Denis may be called to testify as an expert witness.

Professor Denis is the Roger Ahlbrandt, Sr. Chair and Professor of Finance at the Katz Graduate School of Business, University of Pittsburgh. He received a B.S. in finance and managerial statistics from Syracuse University (1982), an M.B.A. from the University of Michigan (1984), and a Ph.D. in finance from the University of Michigan (1988). He has also taught at the University of Toledo (1988-1989), Virginia Tech (1989-1995), and Purdue University (1995-2011). He has taught courses in corporate finance, investments, and capital markets in the graduate, undergraduate, and executive education programs of these universities. Many of these courses have contained components that analyze stock price valuation and corporate financial policies.

Professor Denis served as a member of the Board of Directors of FuturaGene Corporation (2002-2003) and has served as a consultant to law firms, corporations, and government agencies on various aspects of financial markets and securities including corporate financial policies, bankruptcy and solvency, stock prices, corporate valuation, capital acquisition, corporate governance, executive compensation, mortgage backed securities (MBSs), collateralized mortgage obligations (CMOs), credit quality, and swap transactions.

Professor Denis has published over 50 articles in leading peer-reviewed finance, economics, and management journals, has edited the <u>Handbook of Corporate Finance</u> and has co-edited a book on corporate restructuring. Many of Professor Denis's publications have analyzed the impact of corporate financial policies and information on stock prices. He has served as an Editor of the *Review of Financial Studies* and the *Journal of Corporate Finance*. In this capacity, he has reviewed and edited a large number of academic studies on the topics of market efficiency, stock price valuation, and corporate financial policies.

Professor Denis has also served as an Associate Editor of the Journal of Finance, Journal of Financial Research, Financial Review, and Annals of Finance. He served one term as President of the Financial Management Association and recently completed a seven-year term as a member of the Board of Trustees of that organization.

Professor Denis's *curriculum vitae*, which includes his publications as well as a list of all other cases in which he has testified as an expert at trial or by deposition in the last four years is appended as **Annex C**.

In his role as an expert witness, we anticipate that Professor Denis will testify in the following areas and offer opinions, bases, and reasons to help the jury understand the evidence and to determine facts at issue:

1. An economic analysis of relevant market data (including CytoDyn's stock price) and the large volume of relevant, publicly available information entering the market during the period at issue (including CytoDyn's disclosures and confounding information) is necessary to assess whether, and raises uncertainty concerning the extent to which, the alleged misstatements made or caused to be made by Dr. Pourhassan (i) are associated with CytoDyn's stock price reactions on or about the dates of the alleged misstatements, and (ii) would have influenced a reasonable investor to buy, hold, or sell CytoDyn securities.
2. An analysis of the economic rationale underpinning the exercise of warrants and subsequent stock sales by Dr. Pourhassan is necessary to assess whether, and raises uncertainty concerning the extent to which, those actions are consistent with the allegation that Dr. Pourhassan exercised the warrants to capitalize on material information not known to the public.

Professor Denis's bases and reasons for these opinions include the following:

1. The case materials that Professor Denis considered that were produced by the Government.
2. Professor Denis's expertise in financial markets, securities valuation, and corporate financing strategies.
3. An analysis of a wide array of company disclosures, regulatory filings with the SEC, market and industry news and commentary by informed market participants.
4. Relevant publicly available data and information such as company financial data.

## 4 Dr. Mark Robbins

Dr. Robbins may be called to testify as an expert witness.

Dr. Robbins' *curriculum vitae* is attached as **Annex D** and outlines his qualifications, including a list of all other cases in which he testified as an expert at trial or by deposition during the last 4 years, as well as a list of all publications he authored. As Dr. Robbins' *curriculum vitae* demonstrates, he has over 40 years of experience in the pharmaceutical and biotechnology industries, including at contract research organizations ("CRO") overseeing the clinical, regulatory, and quality assurance aspects relevant to a company's incentives and challenges in bringing innovator and generic drug products to consumers. He has conducted analyses in therapeutic areas that include infectious diseases and oncology, among others.

Dr. Robbins has substantial experience leading clinical and regulatory strategy involving the FDA and developing both New Drug Application ("NDA") and generic Abbreviated New Drug Application ("ANDA") products for commercial sponsors. He has handled numerous negotiations with the FDA, resulting in NDA, Biologics License Application ("BLA"), and ANDA approvals for several therapeutics, many of which were successfully commercialized and launched. He has had several dozen Pre-Investigational New Drug ("IND"), End of Phase 2, pre-NDA, and various Type C meetings with the new drug divisions within the Center for Drug Evaluation and Review and Center for Biologics Evaluation and Review at the FDA.

We anticipate that Dr. Robbins will testify in the following areas and provide the following opinions and context to help the jury understand the evidence and to determine facts at issue:

1. It was generally reasonable and appropriate for Dr. Pourhassan to rely on Amarex and Dr. Kazempour. Indeed, CytoDyn's use of a CRO to manage the drug development process was reasonable and typical, reflecting common industry practice. Further, it was reasonable for CytoDyn and Dr. Pourhassan to rely on a CRO, such as Amarex, as the regulatory agent to manage

the FDA development process and the clinical trial process. Similarly, it was reasonable for Dr. Pourhassan to rely on medical experts, including the CRO, for analyses of the outcomes of the clinical trials. As a CEO without a background in clinical trials or FDA regulatory affairs, it was necessary for Dr. Pourhassan to rely on experts for the appropriate interpretation of clinical trial results, to guide responses to regulatory comments, and for the status of CytoDyn's regulatory submissions.

2. It is understood and expected that CEOs of biopharmaceutical companies, especially pre-commercial ones, will push to achieve aggressive timelines on FDA regulatory milestones with the aim to reach FDA approval in the shortest possible timeline. It is the role and responsibility of CROs to communicate to the management of biopharmaceutical companies achievable timelines and to reject requested timelines that could jeopardize a regulatory filing, and it would be reasonable and appropriate for Dr. Pourhassan to rely on them to do so.

3. To the extent that Amarex wrongly perceived Dr. Pourhassan's April 14, 2020 email as one to submit the BLA incompletely on April 22, 2020 (and indeed Amarex did not submit the BLA on April 22, 2020), it was the role and responsibility of Amarex as CytoDyn's CRO and regulatory agent to reject a filing date that could jeopardize CytoDyn's chances to receive FDA approval.

4. When Amarex submitted the BLA on April 27, 2020, it would be reasonable and appropriate for Dr. Pourhassan to rely on Amarex's representations that Amarex had submitted a completed BLA to the FDA.

5. After Amarex forwarded an email from the FDA to Dr. Pourhassan on April 30, 2020 stating "[t]he BLA application is not considered complete as you yourself [Dr. Kazempour] acknowledged in your covering letter with the April 27, 2020 submission – noting that the clinical datasets remain outstanding. . . . [a]s the regulatory agent on behalf of CytoDyn our expectation is that you have communicated this information to CytoDyn," it would be reasonable and appropriate for Dr. Pourhassan to rely on any Amarex representation (in substance) that the allegedly missing data should not be a concern to Dr. Pourhassan, CytoDyn, or the FDA.

6. Although the FDA refused to file the BLA in July 2020, the issues that the FDA raised with respect to the BLA in its decision to refuse to file did not require any new clinical trials or any new patient data.

7. After submission of a BLA to the FDA, it is typical and expected that it is an iterative process such that there is continued dialogue with the FDA, potential flexibility on supplementing data and it is within the FDA's discretion to continue to work with a sponsor for additional information rather than to issue a refusal to file. It would be reasonable and appropriate for Dr. Pourhassan to expect that there would be such an iterative process with the FDA given the FDA's normal course of conduct, and because, specifically with CytoDyn, the FDA had previously agreed that certain data (e.g., pediatric studies and reproductive monkey studies) could be submitted after BLA submission.

8. It would be reasonable and appropriate for Dr. Pourhassan to express optimism about ultimate FDA approval of leronlimab even if: (a) the FDA issued statements that could be perceived as critical of CytoDyn, including of CytoDyn's public statements; (b) as alleged, the BLA was initially submitted while incomplete; (c) the FDA issued a Refuse to File with respect to the BLA; and/or (d) the FDA expressed disagreement with CytoDyn's view of leronlimab clinical trial results. Such optimism would still be appropriate because: (a) as is well-known and accepted in the biopharmaceutical industry, the FDA often modifies its views, especially following continued engagement with companies and continued review and analysis of drug-related clinical results; and (b) the Phase 3

HIV trial underpinning the BLA had met its primary endpoint and demonstrated a strong safety profile. It would be reasonable and appropriate for CytoDyn and Dr. Pourhassan to rely on Amarex—as Amarex designed, modified and managed CytoDyn's clinical trials and employed a team of experienced biostatisticians to analyze clinical trial results—for the substance of CytoDyn press releases and other public statements (including SEC filings) that reported on clinical trial data and biostatistical analysis.

9. Moreover, with respect to CytoDyn's press releases and other public statements that presented clinical trial results, including with respect to the CD10 and CD12 trial results (clinical trials to evaluate the efficacy and safety of leronlimab for patients with mild to moderate COVID, and patients with severe or critical COVID, respectively), these materials were consistent with the biostatistical analysis that Amarex conducted.

10. Also, with respect to the CD10 and CD12 trial results:

    a. Consistent with opinion #2 above, it is understood and expected that CEOs of biopharmaceutical companies, especially pre-commercial ones, will seek to emphasize for the public favorable portions of clinical trial results such as post hoc analysis data for patient subpopulations.

    b. The statement in CytoDyn's December 22, 2020 press release that CytoDyn's CD10 clinical trial for COVID-19 "produced statistically significant results for NEWS2" is exactly what Dr. Jacob Lalezari stated to the public on September 2, 2020 in Dr. Pourhassan's presence. Given that Dr. Lalezari is an expert in clinical trials for antiviral therapies, and is the current CEO of CytoDyn, it would have been reasonable and appropriate for Dr. Pourhassan to rely on Dr. Lalezari and/or other medical and clinical trial professionals in connection with this statement.

    c. To the extent the Addendum referenced in the Indictment regarding CD12 included post hoc analysis of data for patient subpopulations, these data were presented accurately. For example, the presentation of p-value information was accurate and speaks for itself. Any statements about whether such results are "statistically significant" is a nuanced matter of judgment.

    d. To the extent Dr. Pourhassan made these or other statements regarding statistical information and the efficacy of leronlimab treating certain COVID patient subgroups, in making such statements and believing in their accuracy, it would have been reasonable and appropriate for Dr. Pourhassan to rely on Amarex, medical and clinical trial professionals, and testimonials from patients who took leronlimab.

    e. It was reasonable for Dr. Pourhassan to be optimistic about the CD10 and CD12 trial results based on the statements from medical professionals, including Dr. Lalezari, and the patient subgroup analyses such that Dr. Pourhassan had reason to believe that leronlimab had promise for treating COVID.

Dr. Robbins' bases and reasons for these opinions include the following:

1. The case materials that Dr. Robbins considered that were produced by the Government.

2. Relevant publicly available documents and information that are being produced by Dr. Pourhassan with this disclosure.

Linklaters

3. As described above and in more detail in the attached Annex D, Dr. Robbins' over 40 years of experience advising biopharmaceutical companies on regulatory and business strategy and directly overseeing interactions with various divisions of the FDA, quality assurance, and clinical operations; his educational background in biochemistry, pharmacology, and law; his numerous publications in peer-reviewed scientific journals; and years of teaching topics involving pharmaceutical company start-ups, the drug development process, pharmaceutical regulatory and quality assurance requirements, pharmaceutical patent and antitrust matters, and pharmaceutical licensing.

Dated: March 15, 2024

Carl J. Seiden

By: ______________________________

Carl J. Seiden
9 Harbourton Ridge
Pennington, NJ 08534
609-737-7845
carl@seidenstrategies.com

Dated: March 15, 2024

Jonathan R. Macey, JD

By: ______________________________

Jonathan R. Macey
127 Wall Street
New Haven, CT 06511
203-400-2804
jonathan.macey@yale.edu

Dated: March 15, 2024

David J. Denis, PhD

By: ______________________________

Dr. David J. Denis
324 Mervis Hall
Pittsburgh, PA 15260
412-648-1708
djdenis@katz.pitt.edu

Dated: March 15, 2024

Dr. Mark S. Robbins, PhD, JD

By: DocuSigned by: Mark Robbins
A64CB21CE4AA4F2...

Dr. Mark S. Robbins
President and CEO
Kodiak Strategic Consultants, LLC
3140 Harbor Lane N., Suite 202
Plymouth, MN 55447
msrobbins@kodiakstrategies.com
952-215-5156