**Government Exhibit 8**

Linklaters

Linklaters LLP
601 13th Street NW, #400
Washington, DC 20005
Telephone (+1) 202 654 9200
adam.lurie@linklaters.com

Aaron S.J. Zelinsky
Assistant U.S. Attorney
Office of the U.S. Attorney
District of Maryland
36 South Charles Street
Baltimore, MD 21201

Lauren Archer
Christopher Fenton
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20530

**By Email** March 27, 2024

**Re:** ***United States of America v. Nader Pourhassan and Kazem Kazempour*, Case No. 8:22-cr-440**

Dear Counsel:

We write in response to your March 25, 2024 letter (the "**March 25 Letter**") regarding Dr. Pourhassan's March 15, 2024 expert disclosure (the "**Disclosure**"). The Government stated that the disclosure of Dr. Pourhassan's expert witness, Dr. Mark Robbins, is deficient "because it does not provide 'a complete statement of all opinions that the defendant will elicit from [Dr. Robbins] in the defendant's case-in-chief [and] the bases and reasons for them' as required by Rule 16(b)(1)(C)(iii)." Dr. Pourhassan disagrees with the Government's position and submits that the Disclosure is sufficient and fully complied with the requirements set forth in Fed. R. Crim. P. 16(b)(1)(C).

Contrary to the Government's assertions, the Disclosure fully satisfies the requirements of Rule 16. Under Fed. R. Crim. P. 16(b)(1)(C), the Disclosure contains "a complete statement of all opinions that the defendant will elicit from the witnesses in the defendant's case-in-chief; the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Indeed, as the Committee Notes on the 2022 Amendments to Rule 16 make

clear, "[a]lthough the language of some of these provisions is drawn from [Federal Rule of Civil Procedure] 26, the amendment is not intended to replicate all aspects of practice under the civil rule in criminal cases, which differ in many significant ways from civil cases." One "significant way" in which the rules applicable to Rule 16 differ is that unlike Federal Rule of Civil Procedure 26, Rule 16 "requires a complete statement of all opinions the expert will provide, *but does not require a verbatim recitation of the testimony the expert will give at trial*." *See* Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment. Moreover, unlike Civil Rule 26, an expert disclosure under Rule 16 need not list all the "facts and data" considered by a witness in arriving at an opinion.

Dr. Robbins' Disclosure provides a sufficient level of detail as to the role of a contract research organization ("CRO") and its interactions with the FDA and the Sponsor, among others outlined in detail in such Disclosure, and are all that Rule 16 require. *See, e.g.*, *United States v. Brown*, No. 322CR00033BJBCHL, 2023 WL 5002872, at *2 (W.D. Ky. Aug. 4, 2023) (rejecting the government's argument that an expert report failed to recite opinions with the requisite level of specificity or provide the bases for opinions because "[w]hen read together, [the expert's] statements set forth an analysis that supports his opinions . . . [t]he Court finds that the disclosure is sufficient given that [the expert's] statements set forth an analysis that supports his opinion without any indication that there are gaps in the information provided"); *United States v. Lipscomb*, 539 F.3d 32, 37 (1st Cir. 2008) (expert disclosure complied with Rule 16 where "there was no dispute that [the defendant] was on notice with respect to the particular conclusions drawn by" the expert witnesses).

Notwithstanding the foregoing, in a good faith attempt to address the Government's concerns, where appropriate, Dr. Pourhassan offers the following responses and summaries of responsive information. To the extent these responses provide further disclosure about the expected testimony of Dr. Robbins, we would expect Dr. Robbins to testify consistently with such further disclosure.

With respect to the bases and reasons for Dr. Robbins' as previously stated in his *curriculum vitae* and in his Disclosure, Dr. Robbins has over 40 years of experience in the pharmaceutical and biotechnology industries, including at CROs overseeing the clinical, regulatory, and quality assurance aspects relevant to a company's incentives and challenges in bringing innovative and generic drug products to consumers. Based on Dr. Robbins' decades of experience in the pharmaceutical and biotechnology industries, Dr. Robbins is qualified to opine on topics related, but not limited to: the FDA drug approval process, including the approval process and requirements for BLAs; the iterative nature of the FDA approval process, including negotiations with the FDA during the approval process between biopharmaceutical companies, CROs, and the FDA; and the contents of regulatory submissions to the FDA, including clinical portions of such submissions. During his over 40-year career, Dr. Robbins has worked with CEOs and all levels of management at biopharmaceutical companies and CROs in addition to medical experts, scientific advisors, clinical research scientists, and medical thought leaders. Dr. Robbins has also engaged with various officials at the FDA over the course of his career, working closely with FDA officials during the drug development and approval process.

We reproduce the Government's Requests and provide our responses under each Request below.

Government's Request No. 1: *The disclosure states "It was generally reasonable and appropriate for Dr. Pourhassan to rely on Amarex and Dr. Kazempour. Further, it was reasonable for CytoDyn and Dr. Pourhassan to rely on a CRO, such as Amarex, as the regulatory agent to manage the FDA development process and the clinical trial process. Similarly, it was reasonable for Dr. Pourhassan to rely on medical experts, including the CRO, for analyses of the outcomes of the clinical trials. As a CEO without a background in clinical trials or FDA regulatory affairs, it was necessary for Dr. Pourhassan to rely on experts for the appropriate interpretation of clinical trial results, to guide responses to regulatory comments, and for the status of CytoDyn's regulatory submissions." The disclosure does not set forth Dr. Robbins's specific opinions about Dr. Pourhassan's purported reliance on Amarex, Dr. Kazempour, or medical experts (and does not even identify the medical experts about which Dr. Robbins expects to offer an opinion). The disclosure also does not set forth the basis and reasons for Dr. Robbins's opinions, including the evidence that purportedly shows Dr. Pourhassan in fact relied on Amarex, Dr. Kazempour, or medical experts.*

RESPONSE: In response to Government's Request No. 1, Dr. Robbins' opinion as stated in his Disclosure is the opinion he intends to offer in his testimony. Specifically, Dr. Robbins will testify to the types of documents, nature of information, and types of individuals in companies that a CEO of a biopharmaceutical company would reasonably and appropriately rely upon during the drug development and FDA submission process. Dr. Robbins' testimony will be based on his experience described above and in his Disclosure, that it was reasonable for a CEO without a background in clinical trials or FDA regulatory affairs, to rely on individuals such as medical professionals, including Dr. Scott Kelly, Dr. Jay Lalezari, Dr. Jonah Sacha and numerous other CytoDyn consultants on leronlimab, and Kazem Kazempour, Kush Dhody, Ahmad Bayat, Hana Mekonnen and others at Amarex for analyses on the outcomes of clinical trials. The documents listed in Dr. Pourhassan's exhibit list represent the types of information that a CEO of a biopharmaceutical company would rely upon during the drug development and FDA submission process.

Government's Request No. 2: *The disclosure states "It is understood and expected that CEOs of biopharmaceutical companies, especially precommercial ones, will push to achieve aggressive timelines on FDA regulatory milestones with the aim to reach FDA approval in the shortest possible timeline." The disclosure does not identify by whom "[i]t is understood and expected". The disclosure also does not set forth the bases and reasons for Dr. Robbins's opinions. Moreover, to the extent that Dr. Robbins intends to testify that it is "understood and expected" by the public or shareholders that CEOs of biopharmaceutical companies will push to achieve aggressive timelines on FDA regulatory milestones, the disclosure does not set forth Dr. Robbins's qualifications to offer such an opinion.*

RESPONSE: The Government misconstrues Dr. Robbins' Disclosure. Dr. Robbins does not intend to testify as to what the "public or shareholders" necessarily expect. As stated in Dr. Robbins Disclosure, Dr. Robbins will testify that based on his extensive experience in the pharmaceutical and biotechnology industries described at length above, including working with CEOs of biopharmaceutical companies and

CROs, it is well-known, expected and accepted within the biopharmaceutical industry that CEOs of biopharmaceutical companies will behave in such a way as to push to achieve aggressive timelines on FDA regulatory milestones to reach FDA approval in the shortest possible timeline.

Government's Request No. 3: *The disclosure states "It is the role and responsibility of CROs to communicate to the management of biopharmaceutical companies achievable timelines and to reject requested timelines that could jeopardize a regulatory filing, and it would be reasonable and appropriate for Dr. Pourhassan to rely on them to do so." The disclosure does not set forth Dr. Robbins's specific opinions about Dr. Pourhassan's purported reliance on Amarex or Dr. Kazempour. The disclosure also does not set forth the basis and reasons for Dr. Robbins's opinions, including the evidence that purportedly shows Dr. Pourhassan in fact relied on Amarex or [sic] Dr. Kazemour.*

RESPONSE: Dr. Robbins will testify to the types of documents, nature of information, and types of individuals in companies that a CEO of a biopharmaceutical company would rely upon during the drug development and FDA submission process. Dr. Robbins' testimony will be based on his experience described above and in his Disclosure. The documents listed in Dr. Pourhassan's exhibit list represent the types of information that a CEO of a biopharmaceutical company would rely upon during the drug development and FDA submission process.

Government's Request No. 4: *The disclosure states "To the extent that Amarex wrongly perceived Dr. Pourhassan's April 14, 2020 email as one to submit the BLA incompletely on April 22, 2020 (and indeed Amarex did not submit the BLA on April 22, 2020), it was the role and responsibility of Amarex as CytoDyn's CRO and regulatory agent to reject a filing date that could jeopardize CytoDyn's chances to receive FDA approval." The disclosure does not state whether Dr. Robbins will offer a specific opinion as to Dr. Pourhassan's meaning in writing his April 14, 2020 email. To the extent Dr. Pourhassan intends to elicit from Dr. Robbins's testimony about Dr. Pourhassan's meaning in writing the April 14, 2020 email, the disclosure must contain the specific opinion Dr. Robbins will offer and the bases and reasons for that opinion. The disclosure should also state Dr. Robbins's qualifications to offer such an opinion. With respect to Dr. Robbins's opinion about Amarex's "role and responsibility", the disclosure does not set forth Dr. Robbins's specific opinions or the bases and reasons for them.*

RESPONSE: The Government again misconstrues Dr. Robbins' opinion. Dr. Robbins does not intend to testify as to Dr. Pourhassan's intended meaning in the April 14, 2020 email. Rather, as stated in his Disclosure, Dr. Robbins will testify that based on his decades of experience described above and in his Disclosure, including his experience preparing FDA drug approval applications and working at a CRO, that it was the role and responsibility of Amarex as CytoDyn's CRO and regulatory agent to communicate with the sponsor and to reject a filing date that would result in a FDA refusal to file and could jeopardize the sponsor's chances to receive FDA approval.

Government's Request No. 5: *The disclosure states "When Amarex submitted the BLA on April 27, 2020, it would be reasonable and appropriate for Dr. Pourhassan to rely on Amarex's representations that Amarex had submitted a completed BLA to* the *FDA." The disclosure does not set forth Dr. Robbins's*

*specific opinions. The disclosure also does not set forth the basis and reasons for Dr. Robbins's opinions, including the evidence showing: (i) what representations Amarex purportedly made to Dr. Pourhassan; or (ii) that Dr. Pourhassan in fact relied on Amarex.*

RESPONSE: Dr. Robbins will testify that based on his decades of experience described above, including his experience preparing FDA drug approval applications and working at a CRO, it would be reasonable and appropriate for Dr. Pourhassan to rely on Amarex's representations that Amarex had submitted a completed BLA to the FDA on April 27, 2020. Dr. Robbins has considered representations made to Dr. Pourhassan by Amarex and Dr. Kazempour about the April 27, 2020 BLA submission, including Amarex's public statements on the BLA submission on April 27, 2020, which are included in Dr. Pourhassan's exhibit list.

Government's Request No. 6: *The disclosure states "it would be reasonable and appropriate for Dr. Pourhassan to rely on any Amarex representation (in substance) that the allegedly missing data should not be a concern to Dr. Pourhassan, CytoDyn, or the FDA." The disclosure does not set forth Dr. Robbins's specific opinions. The disclosure also does not set forth the basis or reasons for Dr. Robbins's opinions, including the evidence showing: (i) what representations Amarex purportedly made to Dr. Pourhassan; or (ii) that Dr. Pourhassan in fact relied on Amarex.*

RESPONSE: Dr. Robbins will testify based on his decades of experience described above, including his experience preparing FDA drug approval applications and working at a CRO, that it was reasonable and appropriate for Dr. Pourhassan to rely on any Amarex representation (in substance) that the allegedly missing data should not be a concern to Dr. Pourhassan, CytoDyn, or the FDA. The documents listed in Dr. Pourhassan's exhibit list represent the types of information that a CEO of a biopharmaceutical company would rely upon during the drug development and FDA submission process.

Government's Request No. 7: *The disclosure states "Although the FDA refused to file the BLA in July 2020, the issues that the FDA raised with respect to the BLA in its decision to refuse to file did not require any new clinical trials or any new patient data." The disclosure does not set forth Dr. Robbins's specific opinions or the bases and reasons for them.*

RESPONSE: Dr. Robbins will testify based on his review of the FDA's July 8, 2020 Refusal to File letter and the BLA package submitted for leronlimab on April 27, 2020, and based on his over 40 years of experience described above, including his experience preparing FDA drug approval applications, that the issues that the FDA raised with respect to the BLA in its decision to refuse to file did not require any new clinical trials or any new patients to be enrolled in the clinical trials.

Government's Request No. 8: *The disclosure states "After submission of a BLA to the FDA, it is typical and expected that it is an iterative process such that there is continued dialogue with the FDA, potential flexibility on supplementing data and it is within the FDA's discretion to continue to work with a sponsor*

*for additional information rather than to issue a refusal to file. It would be reasonable and appropriate for Dr. Pourhassan to expect that there would be such an iterative process with the FDA given the FDA's normal course of conduct, and because, specifically with CytoDyn, the FDA had previously agreed that certain data (e.g., pediatric studies and reproductive monkey studies) could be submitted after BLA submission." This disclosure is even more opaque than the others contained therein. The disclosure does not explain what is meant by the following words and phrases, all of which are vague and ambiguous: "continued dialogue" "potential flexibility", "supplementing data" "continue to work with a sponsor for additional information", and "normal course of conduct". The suggestion made in the disclosures is that, while the FDA has policies and practices, and communicates requirements to sponsors, it is the FDA's "normal course of conduct" to ignore or set aside those policies, practices and communications and that they are without meaning and not followed by the FDA staff. If that is indeed Dr. Robbins's opinion about the FDA's "normal course of conduct", the disclosure should state as much in clear terms that articulate specifically what Dr. Robbins will testify at trial. If Dr. Robbins's opinion about the FDA's "normal course of conduct," the disclosure should state as much in clear terms that articulate specifically what Dr. Robbins will testify at trial. If Dr. Robbins's opinion is different, then disclosure should contain "a complete statement of all opinions" on this point that Dr. Pourhassan intends to elicit from Dr. Robbins at trial. The disclosure also does not contain the bases and reasons for whatever opinion Dr. Robbins will offer on this.*

RESPONSE: The words and phrases "continued dialogue" "potential flexibility", "supplementing data" "continue to work with a sponsor for additional information", and "normal course of conduct" are standard terms and are offered for their ordinary meaning. They are also used to describe communications with the FDA and they carry their standard meanings in Dr. Robbins' Disclosure. Dr. Robbins' Disclosure does not suggest that the FDA's "normal course of conduct" is to ignore or set aside its own policies, practices and communications and that they are without meaning and not followed by the FDA staff. As stated in Dr. Robbins' Disclosure, Dr. Robbins intends to testify that it would be reasonable and appropriate for Dr. Pourhassan to expect that the post-submission process for a BLA would be an iterative review process involving continued dialogue with the FDA and potential flexibility on supplementing data at the FDA's discretion. Dr. Robbins bases the above option on his experience submitting drug applications to the FDA and his experience with the iterative process between the FDA, biopharmaceutical companies, and CROs after submission of an application for drug approval.

Government's Request No. 9: *The disclosure states "It would be reasonable and appropriate for Dr. Pourhassan to express optimism about ultimate FDA approval of leronlimab even if: (a) the FDA issued statements that could be perceived as critical of CytoDyn, including of CytoDyn's public statements; (b) as alleged, the BLA was initially submitted while incomplete; (c) the FDA issued a Refuse to File with respect to the BLA; and/or (d) the FDA expressed disagreement with CytoDyn's view of leronlimab clinical trial results." The disclosure does not explain what is meant by "express optimism". To the extent Dr. Pourhassan intends to elicit from Dr. Robbins testimony about Dr. Pourhassan's allegedly false and misleading statements, the disclosure does not identify the particular statements about which Dr. Robbins will testify or Dr. Robbins' specific opinions about those particular statements. The disclosure does not provide the bases and reasons for each opinion. The disclosure also does not set forth Dr. Robbins's qualifications to offer expert opinion testimony about what information Dr. Pourhassan did or did not have a duty to disclose to CytoDyn's investors and the public generally. For example, will Dr. Robbins purport to rely on his experience as a lawyer?*

RESPONSE: The Government again misconstrues Dr. Robbins' opinion. Dr. Robbins uses the phrase "express optimism" in its plain meaning. Dr. Robbins never purported to rely on his experience as a lawyer and never represented to be a securities lawyer opining on the level of information that is required to be disclosed to CytoDyn investors. Rather, as stated in his Disclosure, Dr. Robbins' opinion will concern public statements made by Dr. Pourhassan or CytoDyn at issue in the Indictment.

Government's Request No. 10: *The disclosure states "it is well-known and accepted in the biopharmaceutical industry, the FDA often modifies its views, especially following continued engagement with companies and continued review and analysis of drug-related clinical results". The disclosure does not provide Dr. Robbins's specific opinions or the base and reasons for them. For example:*

- *"[W]ell-known and accepted" by whom in the biopharmaceutical industry?*
- *What "views" does the FDA "often modif[y]" and when?*
- *What is meant by "continued engagement with companies"? What "companies"?*
- *What is meant by "continued reviewed analysis of drug-related clinical results"? Is this meant to refer to the FDA's review process for a BLA?*

RESPONSE: When Dr. Robbins stated that "it is well-known and accepted in the biopharmaceutical industry," Dr. Robbins was referring to a practice that is well-known and accepted by key actors in the biopharmaceutical industry, including biopharmaceutical executives and individuals at CROs. Additionally, Dr. Robbins' reference to the "views" that the FDA "often modifies" is with respect to the FDA's broad discretion to modify its decisions as a result of negotiations and continued dialogue with biopharmaceutical companies and CROs. Dr. Robbins' reference to "continued engagement with companies" is with respect to the FDA's standard practice of post-submission communications with biopharmaceutical companies and CROs. Finally, Dr. Robbins' reference to the "continued reviewed analysis of drug-related clinical results" is with respect to the FDA's review process for all types of drug approval applications, inclusive of BLAs. As with the above, Dr. Robbins' testimony will be based on his decades of experience in the pharmaceutical and biotechnology industries.

Government's Request No. 11: *The disclosure states "It would be reasonable and appropriate for CytoDyn and Dr. Pourhassan to rely on Amarex… for the substance of CytoDyn press releases and other public statements (including SEC filings) that reported on clinical trial data and biostatistical analysis." The disclosure does not identify the press releases, SEC filings and other public statements about which Dr. Robbins will testify or what Dr. Robbins's specific opinion will be. The disclosure also does not provide the bases and reasons for each opinion. The disclosure also does not set forth Dr. Robbins's qualifications to offer expert opinion testimony about what information Dr. Pourhassan did or did not have a duty to disclose to CytoDyn's investors and the public generally. The disclosure also does not set forth Dr. Robbins's qualifications to offer expert opinion testimony about a publicly-traded company's issuance of press releases, filing of periodic or other disclosures with the U.S. Securities & Exchange Commission, and the making of other public statements – or the contents of such press releases, filings, and statement.*

RESPONSE: Dr. Robbins will testify about the public statements at issue in the Indictment. Based on Dr. Robbins' decades of experience in the pharmaceutical and biotechnology industries described above, including working at biopharmaceutical companies and at CROs, Dr. Robbins will testify that it would be reasonable and appropriate for CytoDyn and Dr. Pourhassan to rely on Amarex for the substance of CytoDyn press releases and other public statements that reported on clinical trials, of which the biostatistical data, analysis of drug efficacy and representation of regulatory progress are within Amarex's purview as CytoDyn's CRO. Contrary to the Government's statement in this Request, Dr. Robbins will not opine on what Dr. Pourhassan did or did not have a duty to disclose to CytoDyn's investors and to the public generally.

Government's Request No. 12: *The disclosures with respect to the opinions that Dr. Pourhassan intends to elicit from Dr. Robbins relating to the CD10 and CD12 trial results, as set forth in the disclosure in Items 10.a. – 10.e, are all deficient for the same reasons described above.*

RESPONSE: As previously stated in his Disclosure, Dr. Robbins will testify about the CD10 and CD12 trial results based on Dr. Robbins' review of CD10 and CD12 trial results, the documents listed in Dr. Pourhassan's exhibit list and based on Dr. Robbins' experience in the pharmaceutical and biotechnology industries described above, including drafting clinical portions of BLAs.

Government's Request No. 13: *In addition, while the CV attached to the disclosure provides a list of Dr. Robbins's publications, the disclosure does not state that this list includes all publications that he authored in the previous 10 years, as required by Rule 16(b)(1)(C)(iii).*

RESPONSE: Dr. Robbins' CV attached to his Disclosure includes all of his publications, including publications published prior to 2014.

We do anticipate that Dr. Robbins' testimony will be supplemented based on the additional internal FDA correspondence that the Government has been required to produce over the next month.

Dated: March 27, 2024

Mark S. Robbins

By: DocuSigned by: Mark Robbins 3/27/2024 | 1:12 PM CDT
A04CB21CE4AA4F2...

Mark S. Robbins, Ph.D., J.D.
President and CEO
Kodiak Strategic Consultants, LLC
3140 Harbor Lane N., Suite 202
Plymouth, MN 55447
msrobbins@kodiakstrategies.com
952-215-5156