## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**NADER POURHASSAN and**<br>**KAZEM KAZEMPOUR,**<br><br>Defendants. | **CRIMINAL NO. 8:22-cr-00440-PX** |

## GOVERNMENT'S REPLY REGARDING THE SENTENCING GUIDELINES & PRELIMINARY §3553(a) ARGUMENTS

# TABLE OF CONTENTS

I.    REPLY TO DEFENDANTS' GUIDELINES BRIEFS..................................................... 1

   A.    The Government Has Established a Reasonable Estimate of Loss..................................... 1

      i.    Event Studies Are Not Required ................................................................. 2

      ii.   Defendant Pourhassan Intended to Harm Investors........................................... 3

      iii.  The Fourth Circuit Has Rejected a Loss-Causation Requirement ................................ 4

      iv.   Pourhassan Was Convicted of Multiple Fraudulent Schemes ....................................... 6

   B.    Acquitted Conduct Does Not Eliminate Kazempour's Gain ............................................ 7

      i.    The Government Did Not Rely on Acquitted Conduct..................................................... 7

      ii.   Loss Cannot Reasonably be Determined, and Gain is the Proper Measure for
            Defendant Kazempour ......................................................................................11

   C.    The Government Has Established Substantial Financial Hardship ................................. 14

   D.    Defendant Kazempour Occupied a Position of Trust ....................................................... 14

II.   GOVERNMENT'S PRELIMINARY §3553(a) ARGUMENTS.......................................... 16

   A.    This is a Crime About Victims.......................................................................................... 16

   B.    Pourhassan ..................................................................................................................... 17

   C.    Kazempour ..................................................................................................................... 19

   D.    Fine ................................................................................................................................ 20

III.  CONCLUSION....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416 (4th Cir. 1996) .................................................... 9

*United States v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999) .............................................................. 15

*United States v. Amin*, 839 Fed. App'x 810 (4th Cir. 2021).......................................................... 3

*United States v. Berman*, No. 24-3044, 2025 WL 2088508 (D.C. Cir. July 25, 2025).................. 5

*United States v. Escamilla*, 509 Fed. App'x. 254 (4th Cir. 2013).................................................. 12

*United States v. McClinton*, 143 S. Ct. 2400 (2023)....................................................................... 10

*United States v. Poulson*, 871 F.3d 261 (3d Cir. 2017) .................................................................. 14

*United States v. Powell*, 650 F.3d 388 (4th Cir. 2011) .....................................................................11

*United States v. Rand*, 835 F.3d 451 (4th Cir. 2016)................................................................. 1, 4-6

*United States v. Reid*, 164 Fed. App'x 308 (4th Cir. 2006)........................................................... 15

*United States v. Scott*, 779 F. Supp. 3d 937 (N.D. Ohio 2025) ...................................................... 9

*United States v. Shanks*, No. 24-12247, 2025 WL 1621179 (11th Cir. June 9, 2025) ................. 10

**Statutes**

15 U.S.C. § 78ff(a)............................................................................................................................ 20

18 U.S.C. § 3571(d) .......................................................................................................................... 20

**Other Authorities**

21 C.F.R. § 207.69............................................................................................................................ 15

Mustoko, Matthew L., and Margaret E. Mazzeo. "*Loss Causation on Trial in Rule 10B-5 Litigation a Decade after DURA*," 70 Rutgers Univ. Law Rev. 175, (2017)…………………………………....3

*Sentencing Practice Talk: Episode 27, Part 2*, United States Sentencing Commission (Oct. 31, 2024) ................................................................................................................................................. 7

U.S.S.G. §1B1.3................................................................................................................................. 10

U.S.S.G. §1B1.3 cmt. n. 10............................................................................................................ 7, 9

U.S.S.G. §1B1.3(c) ................................................................................................ 7, 10

U.S.S.G. §2B1.1 ...................................................................................................... 1, 6

U.S.S.G. §2B1.1, cmt. n. 3(B) ............................................................................... 1, 12

U.S.S.G. §4C1.1(a)(6) ............................................................................................. 14

U.S.S.G. §5E1.2(c)(4) ............................................................................................. 20

**Rules**

Fed R. Evid. 1101(d)(3) ...........................................................................................11

The United States of America, by and through its undersigned attorneys, hereby files this memorandum replying to Defendants Nader Pourhassan and Kazem Kazempour's briefs regarding the United States Sentencing Guidelines ("Guidelines"), ECF Nos. 339, 340, and previewing the government's position on sentencing. The government respectfully submits that that the Court impose below-Guideline sentences of 96 months' imprisonment for Defendant Pourhassan and 48 months for Defendant Kazempour.

## I.    REPLY TO DEFENDANTS' GUIDELINES BRIEFS[1]

### A.  The Government Has Established a Reasonable Estimate of Loss

The Guidelines are clear that a sentencing court has great discretion in evaluating loss under U.S.S.G. §2B1.1. The standard is to calculate a "reasonable estimate" that is given significant deference. *Id.*, cmt. n. 3(B). It is not that there must be an event study. That, of course, could not be the standard because there are situations where an event study does not make sense, such as when there is an inefficient market or when a stock is not correlated to another market or when the conduct being measured was a multi-year scheme. Additionally, in rejecting the *Dura* standard for criminal sentencings, the Fourth Circuit has held that there is no loss causation requirement. Suggesting the opposite, Defendant Pourhassan's brief wrongly claims that this is a required *element* of the loss analysis. ECF No. 339 at 7. Nothing could be more squarely at odds with the controlling law. *United States v. Rand*, 835 F.3d 451, 469 (4th Cir. 2016) (holding there is no requirement of "a causal connection between the material misrepresentation and the loss" in

---

[1] Both defendants filed 35 page briefs on the sentencing guidelines. In attempting to respond to the most seriously contested issues, the government could not address the arguments made on every facet of the Guidelines and restitution raised by the defendants. Accordingly, in light of the 20 page limit and need to also address § 3553(a), while we address the bulk of the defendants' arguments here, we maintain the government has correctly calculated the Guidelines and oppose defendants' requests to not impose the sophisticated means and the officer and director enhancements, and to order no restitution to any victim. For these provisions, the government submits on its arguments in the prior brief. ECF No. 335.

a criminal securities fraud sentencing).

The government nonetheless proposed a conservative loss estimate. Instead of attempting to encapsulate all of the theoretical market harm based on the thousands of victims, the government has offered a narrow and limited pool of investors based on strict date limits for victims that came forward and provided supporting records. The eminently reasonable resulting loss amount of $5.286 million is only slightly more than the $4.4 million that Defendant Pourhassan was able to nab through insider trading. It is also dwarfed by the loss figure under the modified rescissory method ("MRM"), which would have resulted in approximately $1,147,769,187 in loss. ECF No. 335 at n. 8 (even cutting that figure in half to account for other market forces would still max out the Guidelines' loss table and require 30 levels be added). Looking at a concrete and supported universe of investors that came forward and established their loss during a narrowly drawn view of the scheme period is more than sufficient. The resulting 18-level increase has both been established by a preponderance of the evidence and is within the heartland of the reasonable approaches for estimating loss in a fraud case.

### i.    Event Studies Are Not Required

Boiled down, Defendant Pourhassan's position is that because the government could not conduct an event study (given the inefficient market that CYDY traded in), there is no loss amount. That is not the case. This argument suffers from logical fallacies and a lack of legal support, and he offers no authority for this extreme proposition. Most notably, the Guidelines do not mandate an event study. Moreover, it could not be the strict requirement that Defendant Pourhassan suggests because there are situations, like here, where the stock trades in an inefficient market and—as conceded—an event study would not be appropriate. *Daubert* Hearing Tr. 64:19-24. The Guidelines' elastic approach to calculating loss allows for the methodology used here. This makes

sense given that an event study is focused on singular misstatements whereas Defendant Pourhassan was convicted of multiple schemes to defraud. One of the event study's glaring deficiencies is that instead of focusing on all of the revelations after months of Defendant Pourhassan's lies about Covid-19 in the FDA's May 17, 2021 statement, GX 636, the event study erroneously suggests that it only corrected the misrepresentations since March 30, 2021. This is simply inconsistent with the facts developed at trial and the literature on measuring fraud price impact, particularly in a scheme context.[2] The government's approach focuses on verifiable victim losses, uses a narrow window of the schemes of conviction, and nets out intra-scheme sales and the post-corrective disclosure stock price.[3] This ensures that only the price inflation during the schemes is captured even when an event study cannot be conducted. *See* ECF No. 335, n. 6.

### ii. Defendant Pourhassan Intended to Harm Investors

Defendant Pourhassan says that the government must show that he intended to cause this harm. *See United States v. Amin*, 839 Fed. App'x 810, 811 (4th Cir. 2021) (affirming the district court's finding of $6 million loss that was reasonably foreseeable to the defendant based on "his direct role in the fraud scheme"). It did—at trial. Necessary in at least his wire fraud conviction

---

[2] "[D]amages are measured by looking at the magnitude of the stock drop upon revelation of the fraud-not by assigning a fraction of the total damages to each individual misstatement. . . [T]he price reaction when the market learns the truth about the misstatement—that is, at the time of a corrective disclosure—is what ultimately establishes whether the misstatement at the time it was made resulted in fraudulent distortion (even if it was a confirmatory lie)." Mustoko, Matthew L., and Margaret E. Mazzeo. "*Loss Causation on Trial in Rule 10B-5 Litigation a Decade after DURA*," 70 RUTGERS UNIV. LAW REV. 175, (2017) (discussing defendants who maintain price inflation by the "repetition of the same falsehoods to the market") (internal punctuation omitted).

[3] As this Court is well aware, it never made a finding that Denis's claim of market efficiency was correct. Quite the contrary, the Court raised substantial skepticism with his ever-evolving opinion at the *Daubert* hearing, *see* ECF No. 335 at n. 19, and, at the pre-trial conference, the Court clearly ruled only that it was a question "that must be left to the jury." In any event, as the defendant makes clear, it is the government's burden to establish loss. It has done so without needing an event study. Given the defendant's attacks on the government's methodology and the substantial reasons argued in the government's moving brief (and in response to Defendant Pourhassan's Exhibit 27, *see* Exhibit D), there is no need for Denis to testify at the sentencing hearing. Any evidentiary value the Court may ascribe to his flawed event study can be incorporated through his written report.

is that the defendant sought to obtain money or property by deceit.  Each count of conviction required specific criminal intent.  The trial was largely about Defendant Pourhassan's intent and the Court can rely on the ample evidence that it was Defendant Pourhassan's obsession with the stock price and tricking investors into transacting at inflated prices that drove this crime.  *See* GX 2, GX 10A, GX 167, Tr. Vol. 6, 222:23-223:22 (Dr. Ray testifying that Defendant Pourhassan "directly linked" the submission of the BLA to the need to sell securities to investors).  When the defendant ordered that the incomplete BLA be submitted, he made abundantly clear why he was doing so.  GX 2 (referencing a 20% stock price drop and stating that the "drop will be much deeper if we don't file our BLA as the message board is now getting bombarded by investors who are very frustrated with me and CytoDyn" and "if the stock continues its drift financially we will have problems financing itself").  Defendant Pourhassan was ordering a fraudulent act in furtherance of the scheme for the very purpose of inflating the company's stock price.  That investor victims would suffer the harm was known to him and entirely foreseeable, as revealed by his own words.

### iii.    The Fourth Circuit Has Rejected a Loss-Causation Requirement

As for Defendant Pourhassan's assertion that there is a strict but-for and proximate loss causation test required for loss, he offers no Fourth Circuit case or Guidelines provision.  ECF No. 339 at 7.  This is particularly surprising given that the Fourth Circuit rejected the civil loss causation standard for securities fraud sentencings in *Rand*, 835 F.3d at 469 ("we decline to adopt the *Dura* principles in the criminal context").[4]  In *Rand*, the Fourth Circuit  makes clear that "even if various individual victims' respective losses cannot be precisely determined or linked to the fraud[,]" the defendant is still responsible for the "aggregate loss to society in the amount of the

---

[4] For this reason, Defendant Pourhassan's myriad citations to civil securities fraud cases discussing event studies, *see* ECF No. 339 at 7, are of no relevance—they are aimed at a requirement from *Dura* that is not germane to these proceedings.

fraud-induced overvaluation[.]" *Id.*. Defendant Pourhassan fails to grapple with either of the key aspects of *Rand* that drive the government's recommended loss calculation here. He neither explains the source of his causation test despite *Rand*[5] nor does he explain why *Rand*'s explicit consideration of "scheme" harm should be ignored.

In any event, if causation were required, the government has established it. *First*, at trial four different victim investors testified that they relied on Defendant Pourhassan's false statements. *See* ECF No. 335, n. 13. *Second*, the government established beyond a reasonable doubt that the fraudulent schemes were material. *See* ECF No. 315 at 15-28. *Third*, the government has included numerous VIS explicitly stating that the victim relied on Defendant Pourhassan's lies in making their investment decision. *See, e.g.*, VIS-001, 071, 110, 158, 166, 183, 191. It is unclear what could be more probative of causation. *Fourth*, at trial, it was clearly established that this was pre-revenue, pre-approval single drug company and there was nothing more important to the company than getting approval. Tr. Vol. 10, 243:12-244:9 (Court's ruling on Defendant Pourhassan's Rule 29 motion at trial: "there has been substantial evidence that that's within the market of the single-drug prerevenue company that filing the BLA would be material to the investor public"). The only viable applications were those at the center of the schemes of conviction: HIV and COVID-19. *Fifth*, the stock price was only inflated during the period of the scheme—it went up when Defendant Pourhassan ramped up his rhetoric about a BLA application and began his campaign of lies regarding Covid-19. *See* Exhibit GX 901. And it quickly crashed to the pre-pump levels once the truth was revealed. *See* ECF No. 335 at 17 (discussing *United States v. Berman*, No. 24-3044, 2025 WL 2088508, at *3 (D.C. Cir. July 25, 2025)). *Sixth*, a review of the price charts for the NASDAQ composite, OTCQB, and NASADQ Biopharma Index for the same period reveal CYDY did not

---

[5] ECF No. 339 at 3 (citing *Rand* but ignoring that loss causation was rejected ); 7 (stating causation test).

follow the price path of any of these purported peers during the periods of the scheme. *See* Exhibits A and B (explaining indices). This is consistent with Denis's inability to find positive correlation between CYDY stock and his purported comparative markets. *See* ECF No. 335 at 19; Exhibit D.

### iv.     Pourhassan Was Convicted of Multiple Fraudulent Schemes

Ultimately, Defendant Pourhassan mistakes this case for a standalone misstatement case where an analysis of the individual misstatements offer isolated events that can be stood up for purposes of determining the market movement on that day. This case is ultimately simpler. Defendant is convicted of a multi-year scheme filled with his rampant misstatements creating false hope, providing unrealistic timelines, and making explicit false statements. The loss caused by the scheme encapsulates all of that, not just the instances where the defendant made a specific misstatement. Defendant's complaints about the failure to identify a stock price increase are unfounded and seem to ignore that defendant was convicted of a scheme that went from 2018 to 2021. Even starting at Dec. 2018, the stock price was at $.59, rose to $8.77 at the peak of the schemes, and then crashed down to less than a dollar by the end of 2021. *See* GX 849. In attempting to divert attention from the fact that Defendant Pourhassan was convicted for multiple schemes to defraud, he claims that the government failed to calculate "what losses actually 'resulted' from any of the **statements** Dr. Pourhassan made[,]" citing U.S.S.G. §2B1.1(b)(1)(C)(i). ECF No. 339 at 11 (emphasis added). However, that Guideline provision actually references "harm that resulted from the **offense**." He misses that he was not convicted of individual misstatements, but a scheme. *Cf. Rand*, 835 F.3d at 467 (in securities fraud cases, the court is tasked with the "determination of loss attributable to a fraud **scheme**") (emphasis added). And the evidence at trial, in the VIS, and the conservative calculation offered by the government clearly capture the loss from the two schemes of conviction. Far from a "naked or unsupported charge"

6

this loss calculation is the lived result of the very real victims of these crimes. It is rooted in these individuals coming forward and holding the defendant accountable for the losses he caused them through the fraud he engaged in. As the VIS repeatedly makes make clear – and four different victim witnesses testified at trial – it was defendant's false and misleading statements, throughout his scheme, that resulted in their losses. *See, e.g.*, VIS-001, 071, 110, 158, 166, 183, 191.

### B. <u>Acquitted Conduct Does Not Eliminate Kazempour's Gain</u>

#### i. **The Government Did Not Rely on Acquitted Conduct**

Defendant Kazempour argues that the government's Guidelines calculation improperly includes acquitted conduct by holding him accountable for his participation in the BLA scheme. However, the government has calculated Defendant Kazempour's Guidelines narrowly to avoid including the counts of acquittal.

In November 2024, the United States Sentencing Commission amended the guideline concerning relevant conduct to disallow the use of acquitted conduct in most situations. "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. §1B1.3(c). While the Guidelines leave open the possibility of the use of acquitted conduct, the thrust of the new relevant conduct guidance is clear—acquitted conduct generally cannot be considered as relevant conduct. However, the Commission recognized that the line will not always be easy to draw. *See, e.g.*, U.S.S.G. §1B1.3 cmt. n. 10 ("[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."); *Sentencing Practice Talk: Episode 27, Part 2*, United States Sentencing

Commission (Oct. 31, 2024) (the Commission explaining in its podcast that in promulgating its acquitted conduct amendment, it did not "try and come up with a resolution to every single murky case," instead leaving it to the federal judge who will be better able to parse through the record, using a split verdict between a conspiracy and substantive counts as an example).

The question this Court is presented with is how to interpret the counts of conviction as they relate to Defendant Kazempour's culpability at sentencing. Defendant Kazempour was convicted of two schemes: (1) a securities fraud scheme, the execution of which was Defendant Kazempour's submission of the BLA to the FDA explicitly leaving out required safety and other data (Count 3), and (2) a wire fraud scheme, the execution of which was Defendant Kazempour's attempt to profit off of his and CytoDyn's lie to the investing public that the company had in fact submitted a completed BLA when it had not (Count 8). These counts charged a device, scheme, or artifice to defraud, which was defined for the jury as "merely a plan for the accomplishment of any objective to obtain a thing of value." Instruction No. 37, ECF No. 264.

Defendant Kazempour has provided one interpretation of how far these schemes extended, which he calls a "reasoned analysis" of the verdict: "it is clear that the jury convicted Dr. Kazempour only of submitting the BLA without revised datasets and then emailing the next day about his warrants." ECF No. 340 at 4. However, this interpretation is anything but reasonable. In the first instance, Defendant Kazempour does not address how these two facts, when taken in isolation, could possibly rise to the level of criminal activity. It is undisputed that the email Defendant Kazempour sent to the FDA which comprised Count 3 was facially accurate—he disclosed that there were missing datasets. *See* GX 3. If that email was considered in isolation, it could not have been fraudulent. The same would be true of the email that comprised Count 8. *See* GX 8. Without additional context, neither could be the basis of a criminal conviction.

Additionally, the jury convicted him of executing on a "plan for the accomplishment of any objective *to obtain a thing of value*."  Instruction No. 37 (securities fraud) (emphasis added), ECF No. 264; *see also* Instruction No. 48 (wire fraud), ECF No. 264.  What could the possible thing of value be under Defendant Kazempour's theory?  Given that jurors are presumed to follow their instructions and the jury came to a considered verdict convicting Defendant Kazempour after nearly six days of deliberation, his interpretation simply ignores the verdicts.  *See, e.g.*, *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 427 (4th Cir. 1996) (stating that jurors are presumed to follow the instructions).

The government is not arguing that the acquittals do not matter.  For example, the government is not basing its Guidelines calculation on the COVID-19 scheme.  However, the acquitted conduct guideline does not require this Court to draw the line as narrowly as Defendant Kazempour suggests.  *See* U.S.S.G. §1B1.3 cmt. n. 10 (discussing overlapping conduct).  While courts are still working through how to interpret this amendment, there has been some support for taking a broader approach in evaluating convictions that involve scheme-like behavior.  In the conspiracy context, one court has found that "when calculating the guideline range, a court may consider any evidence of the total loss within the scope of the conspiracy, even if a jury acquitted a defendant of some conduct accounting for some specific loss," citing in part to the commentary discussing overlapping conduct.  *United States v. Scott*, 779 F. Supp. 3d 937, 942 (N.D. Ohio 2025).  In *Scott*, the defendant was convicted of conspiracy to commit securities fraud and securities fraud, but acquitted on two counts of wire fraud.  *Id.*  The jury was instructed that all three crimes required an intent to defraud, and the evidence at trial established that the fraud involved artificially manipulating the price of a stock.  *Id.* at 942-43.  Therefore, the Court found that the counts of conviction subsumed the conduct comprising the counts of acquittal.  *Id.* at 943.

While Defendant Kazempour was not convicted on the conspiracy count, some of the same logic applies to a scheme. The Guidelines specifically discuss how some crimes involve patterns of misconduct "that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." U.S.S.G. §1B1.3 cmt. n. 10 (discussing mail fraud, "the scheme is an element of the offense and each mailing may be the basis for a separate count," among other crimes). Notably, the jury was instructed that each count of Defendant Kazempour's convictions required acting knowingly, willfully and with the intent to defraud. *See* Instructions Nos. 30, 31, 42, 49, ECF No. 264. Curtailing the scheme to the extremes makes it impossible for Defendant Kazempour to have acted with the requisite *mens rea* and specific intent. Expanding it beyond those two days does not require the use of acquitted conduct, it simply means that some of the conduct is overlapping between the counts of conviction and the counts of acquittal.

This is also where the excluded declaration is relevant to Defendant Kazempour's state of mind. The declaration is not acquitted conduct, because acquitted conduct requires a jury to have evaluated the conduct and entered in a judgment of acquittal. *See, e.g.*, *United States v. Shanks*, No. 24-12247, 2025 WL 1621179, at *4 (11th Cir. June 9, 2025) (citing *United States v. McClinton*, 143 S. Ct. 2400, 2402 (2023), for the proposition that acquitted conduct is unique and distinct from conduct the jury never evaluated in rejecting a §1B1.3(c) argument over dismissed conduct). The declaration was never put before a jury, so it is evaluated as potential relevant conduct under U.S.S.G. §1B1.3.

Counsel misstates the record in saying that the declaration was rejected because of its reliability. *See* ECF No. 340 at 7 ("[a]nd, it bears repeating that the Court *excluded* this document from evidence at trial, finding it argumentative, **unreliable**, and unduly prejudicial") (bolded emphasis added). Nowhere in the entire transcript that Defendant Kazempour cites to did the Court

10

rule the declaration to be unreliable. *See generally* Transcript of April 26, 2024 Motions Hearing. It is also puzzling how counsel for Defendant Kazempour would claim that a sworn declaration that their client made to a federal court would be unreliable. Either the statement is unreliable for its falsity—which could itself be a separate crime—or it is unreliable because Defendant Kazempour does not seriously consider his words in sworn declarations. It beggars belief that counsel intended either explanation to apply to their client. The mere fact that the declaration was excluded does not prohibit its use at sentencing. The sentencing court may "consider any relevant information before it…provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Powell*, 650 F.3d 388, 392 (4th Cir. 2011) . Furthermore, there are fundamental differences of evidentiary procedural limitations between a criminal trial and sentencing. *Id.* While this Court excluded the declaration from being introduced at trial because of its argumentative nature, it explicitly contemplated a scenario where portions could be introduced. *See* Transcript of April 26, 2024 Motions Hearing, 10:6-10. At sentencing, where the rules of evidence do not apply, and courts have wide latitude to reach outside of the bounds of the trial evidence, the declaration can and should be considered as relevant evidence in establishing Defendant Kazempour's knowledge, and in turn, the extent of the scheme. *See* Fed R. Evid. 1101(d)(3) (rules of evidence do not apply to sentencing). In any event, GX 167, admitted at trial, is similarly probative of his state of mind in connection with the counts of conviction.

Ultimately, the government has proposed a conservative approach to determining the scheme of Defendant Kazempour's conviction, which respects and reflects the jury's verdict. The Court should find that Kazempour's sentence can be fairly based on the BLA scheme.

### ii. Loss Cannot Reasonably be Determined, and Gain is the Proper Measure for Defendant Kazempour

Paradoxically, it is Defendant Kazempour who seeks to leverage the COVID-19 scheme in

his bid to show that loss can be reasonably determined to be zero dollars. It cannot be.

Defendant Kazempour claims there is no loss, ignoring the fact that CytoDyn's share price was artificially inflated by the scheme to lie to investors about COVID-19. The evidence at trial showed that both schemes were operating simultaneously. *See, e.g.*, GX 36-A (Pourhassan discussing both indications at the beginning of the investor call). This is especially notable because once the COVID-19 scheme was exposed as a fraud on CytoDyn's investors, the share price rapidly dipped below where it had been trading after the refuse to file was announced. *See* GX 849.

Calculating loss as Defendant Kazempour has suggested gives him the benefit of a stock price that was inflated by the fraudulent statements about COVID-19. Additionally, there are myriad problems with conducting an event study on CYDY, making it difficult to disaggregate the share price between the two schemes. *See* ECF No. 335 at 18-27.[6]

In order to use gain as an alternative measure, the government must show that there would have been some loss, but that it reasonably cannot be determined. U.S.S.G. §2B1.1 cmt. 3(B). However, when the nature of the crime was one that causes economic loss, the Fourth Circuit has found that gain could be considered in the alternative, even if there had been no evidence of loss presented. *See United States v. Escamilla*, 509 Fed. App'x. 254, 255 (4th Cir. 2013).

These types of crimes do cause economic loss, and in this case, there is tangible evidence of it. After May 17, 2021, when the COVID-19 scheme had been exposed to the world, and both schemes were over, the value of the stock dipped well below where it was trading on July 10, 2020.

---

[6] Given those issues, the government has taken the position that loss cannot be reasonably determined. However, the government has also provided the Court a measure of victim harm attributable to Defendant Kazempour in the restitution calculation—$409,311.78. If the Court elects to use that number as a calculation of the loss attributable to Defendant Kazempour, the government notes that it does not affect the government's Guidelines calculation.

*See* GX 849.[7]  This means that the BLA scheme did cause investor loss, but given the almost year-long gap after the end of the BLA scheme, that loss is unable to be reasonably estimated.

Turning to gain, the government has proposed using the gain that resulted from the warrants the defendant began executing in the email that comprised his Count 8 conviction.  *See* GX 8. Even if it is an open question how far the scheme extends, surely it extends at least that far. Defendant Kazempour disagrees, and it is in that discussion that the untenable nature of his Guidelines argument truly becomes apparent.  Defendant Kazempour asserts, ignoring the weight of evidence to the contrary and the jury's verdict, that Kazempour's exercise of warrants had nothing to do with the BLA.  *See* ECF No. 340 at 4.

This argument reveals Dr. Kazempour's view that the jury's verdict with respect to Count 8 should be disregarded.  If the exercise had nothing to do with the BLA, the jury could not have convicted Defendant Kazempour of a crime requiring an intent to defraud investors in relation to the BLA.  The jury found that the April 28 email that comprised Count 8 was an execution of the scheme to defraud.  The fact that the warrants were previously awarded is irrelevant, because it presumes that the only relevant date with respect to warrants is the date of issuance.  However, warrants are not stock.  They must be exercised at the time of the holder's choosing in order to convert into stock.  Defendant Kazempour had been holding on to those warrants for two years and chose to begin exercising immediately after he knew he had participated in a scheme to defraud CytoDyn investors by lying to the market about the company's prospects for approval to treat HIV. If it looks like a duck, quacks like a duck, and the jury found that it is a duck, the defendant cannot pretend it is a goose.   This Court should calculate Defendant Kazempour's gain to be $342,750.

---

[7] The government calculated what the loss could be under the modified rescissory method using the post-May 17, 2021 time frame as the relevant measure.  *See* Government's Guidelines Memorandum, ECF No. 335, at 12 n.8 (estimating loss to be more than $1 billion).

C.  **The Government Has Established Substantial Financial Hardship**

Both defendants object to the victim enhancements, specifically taking issue with the fact that their schemes caused victims to suffer substantial financial hardship, but the victim statements are replete with evidence of the harm victims suffered.  *See* Section II.A, *infra*.

Defendant Pourhassan purports to suggest that someone who identified themselves as a victim of the offense, who invested based on Defendant Pourhassan's lies to the market, and who suffered debilitating losses that will affect the remainder of their lives, cannot be a victim because his paid economist said so.  Neither commonsense nor the caselaw require that.  While some courts have found that the substantial financial hardship enhancement requires a finding of both but-for and proximate causation, defendants can point to no case anywhere that requires an event study to prove causation under substantial financial hardship.  Defendant Kazempour also raised a causation issue, and took further issue with the fact that the government alleged that victims suffered substantial financial hardship at the same time it represented that it could not reasonably estimate loss.  Both of these complaints misunderstand the enhancement.  Courts have said that the enhancement is subjective, not requiring identification of finite dollar amounts, and drawing reasonable inferences from the record.  *See United States v. Poulson*, 871 F.3d 261, 268-69 (3d Cir. 2017).  Additionally, Defendant Kazempour's causation argument suffers from the same issue as his loss argument—the COVID-19 scheme propped up the share price, but did not eliminate harm from the BLA fraud.  *See* GX849.  The victims suffered a hardship as a result of the offenses that both Defendants were convicted of, and both Defendants caused those victims to suffer hardship.[8]

D.  **Defendant Kazempour Occupied a Position of Trust**

As the government established in its opening brief, Defendant Kazempour was in a

---

[8] Therefore, neither defendant should qualify for the zero-point offender reduction.  *See* U.S.S.G. §4C1.1(a)(6) ("the defendant did not personally cause substantial financial hardship").

position of trust vis-à-vis the investor victims in this crime.  This comports with the caselaw because he was <u>not</u> an arm's length contractual counterparty, but held an *agency* relationship[9] with the company (owned by its victim investors) and served on the disclosure committee at the behest of and reporting to the Board of Directors.  These are the type of fiduciary-like or personal trust relationships required.  *See United States v. Reid*, 164 Fed. App'x 308, 312 (4th Cir. 2006) (the enhancement requires"[s]omething more akin to a fiduciary function").  Defendant is wrong that there are no victims of his offense.  Even under his own excessively narrow view, investors who were defrauded by his schemes in April 2020 are his victims no matter the extent of their losses.  *See United States v. Akinkoye*, 185 F.3d 192, 204 (4th Cir. 1999) (affirming the enhancement and finding that the relevant victim need not have faced the ultimate cost of the fraud and that the court should consider "the emotional, financial and other burdens borne by the [victims] until the extent of the fraud scheme was exposed and corrected").  Moreover, to be in a position of trust does not require a personal relationship with the victims.  *See id.*

Nonetheless, Defendant Kazempour had a fiduciary-like role, even if the investors did not meet him. Defendant Kazempour focuses on an outside expert to describe the regulatory agent role while ignoring the first-hand experience of a CytoDyn board member and CFO.  *See* ECF No. 335 at 40-41; Tr. Vol. 3, 241 (former Board member testifying that Defendant Kazempour was considered "to be like one of the staff because he -- because of his, you know, integral importance to the ongoing operations to the company.")  Public companies do not put arm's

---

[9] It is unclear why Dr. Kazempour's brief describes his role as that of a "U.S. agent[,]" which is clearly inapplicable here given that CytoDyn was a domestic company.  *Compare* ECF No. 340 at 27-28 *with* 21 C.F.R. § 207.69(b)(1) (concerning "[r]egistrants of foreign establishments").  The more applicable description may be that for the "official contact" who must also "[e]nsur[e] the accuracy of registration and listing information."  21 C.F.R. § 207.69(a)(1).  The listing information is described by the FDA as "essential to promote patient safety."  *See* Exhibit C.  This further ties Defendant Kazempour's use of his role as the regulatory agent to submit an incomplete BLA in furtherance of the fraud.

length third parties in such roles. The extent to which Defendant Kazempour was entrusted by CytoDyn to engage on its behalf with its most important regulator and to weigh in on the significant responsibility of what needed to be disclosed to investors about that relationship says everything about the nature of his role and the trust placed in him.

## II.    **GOVERNMENT'S PRELIMINARY §3553(a) ARGUMENTS**

The government intends to address the entirety of the § 3553(a) factors' application to the defendants' proposed sentences at the hearing, but highlights here the most salient factors for imposing the government's recommended sentence.

### A.    **This is a Crime About Victims**

The most compelling aspect of the nature and circumstances of the offense here—inextricably intertwined with the need to provide restitution in this matter—is the severe impact of the defendants' crimes. At its core, this is a victim-centered offense. Defendants' fraudulent schemes hurt real people and ruined lives. The defendants profited from selling investors a version of the company that did not exist and it was the victims that were left buying shares of CytoDyn at fraudulently inflated stock prices. Tricking investors and ensuring CytoDyn's stock was artificially high was not a byproduct of the scheme, but its stated purpose. *See* GX 2.

The Victim Impact Statements are devastating. Victims believed they were being offered an opportunity to participate in an important opportunity to both assist CytoDyn in saving lives and provide them with financial stability. However, it did neither. And the victims were left to suffer the consequences. The victims wrote of the inability to buy homes; the decimation of retirement savings, including by public servants; the end of relationships; delayed retirements, including a man who needs to work another decade to make up his losses; a couple that needed to lay off workers from their business; an out-of-work actor who had to move in with his parents

because of the losses; a spouse who came out of retirement to take a part-time teaching job to support their family; and an 86-year old on a fixed income who does not have funds for repairs and maintenance on his home. VIS-001, 020, 047, 060, 080, 085, 092-94, 119, 131, 135, 183, 192. It caused pain and hardship, strain on families and marriages, put victims in therapy and onto anti-depressant medication, and caused tears. *See, e.g.*, VIS-001, 015, 040, 138, 192. This type of harm was personified at trial in W.K's powerful response to the very first question on cross examination. Tr. Vol. 4, 169:6-14; *see also* VIS-119. Sadly, again and again, the victims stressed how much this crime deteriorated their trust in others, society, and public companies. *See, e.g.*, VIS-044, 055-56, 064, 068, 079-81, 085, 089, 111, 119, 159, 175. It's revelatory: this was a crime of betrayal, and that is how the victims have experienced it.

The defendants' choice to put their own business interests and personal financial gain above victims was callous and wrong, and that victimization (of investors they held a duty to) should be a driving factor in the Court's consideration of the ultimate sentences. *See* VIS-081 ("This man did lasting harm to my family for personal gain."); VIS-086 ("They lied, and they made money on the lies, and that money came from people like myself.")

## B. <u>Pourhassan</u>

In addition to the to the general victim harm caused by the defendants' scheme, the aggravating nature and circumstances of Defendant Pourhassan's crime is amplified by the direct nature of his lies to the investors. Throughout their submissions, victims repeatedly raised that Defendant Pourhassan lied right to them. They saw him in the investor videos, he spoke on the investor calls, and they read his press releases. It was Defendant Pourhassan that was the direct link between their losses and the lies they were told. *See* VIS-118, 158, 183, 191. He was the face and voice of the fraudulent scheme. Additionally, Defendant Pourhassan is culpable for both

overlapping schemes as well as insider trading. He monetized his fraud, making more than $4 million by trading on material, nonpublic information rooted in his own lie to the market. Ultimately, it is also important to focus on the subject matter of what Defendant Pourhassan was lying about: drugs that people were going to take. He ordered an incomplete BLA be submitted, which had missing safety data about events that led to death. Tr. Vol. 10, 50-51 (testimony of Dr. Sheikh). He wanted the public to believe that the CD-12 trial meant leronlimab was effective for COVID-19—during a still raging pandemic—when the science said it was not. *Compare* GX 71 and GX 628. What Defendant Pourhassan was saying and doing required the FDA to issue an unprecedented statement to try and clarify for the public—for the public's safety—that Defendant Pourhassan was not telling them the truth about this drug during a dark and desperate time. GX 636. Defendant Pourhassan did not just lie for money, he did so in a reckless and dangerous way. He was not, as his counsel now argues, trying to save lives. He just wanted people to believe he sold a drug that could save lives. And this deception is at the root of who this defendant is.

In support of the proposed sentence, the Court should also focus on the recidivist nature of Defendant Pourhassan's deceptive conduct. *See* PSR ¶¶ 76, 79 (a theft by deception conviction and fraud swindle charge). There is also a meaningful opportunity for the Court to serve the goal of general deterrence. Defendant Pourhassan was a public company CEO. One reason that investors trusted him is that they believed public company CEOs would not lie given the significant penalties for doing so. *See* VIS-118. The Court should impose a meaningful sentence to give merit to these investors' beliefs and ensure public company officers know the serious consequences—beyond just paying a penalty—for lying to their investors. Lastly, the proposed sentence conforms with those given to other CEOs recently convicted by the Fraud Section for securities fraud and takes into account Defendant Pourhassan's age and other personal

circumstances.[10]  A sentence of 96 months for Defendant Pourhassan is calibrated to multi-scheme nature of his convictions, his refusal to accept responsibility, and the large pool of victims he impacted.

### C.  Kazempour

Defendant Kazempour was convicted of a scheme to defraud investors by inducing them to invest in CytoDyn based on a false promise that the company was on track to get approval to treat HIV, and Defendant Kazempour profited off his and his co-defendant's lies both by exercising warrants and selling shares in the open market—netting him approximately $340,000—but also by leveraging his company's relationship with its biggest customer, bringing in approximately $5 million to his company in 2020 before the end of the BLA scheme.  *See* GX907.  It is also important to note, between his declaration and GX 167, that Defendant Kazempour has twice admitted that he engaged in the very conduct he is convicted of, but has never taken any responsibility.

Additionally, the offense conduct is more egregious because of the risk of harm it posed to patients—Defendant Kazempour was trying to push through an approval of the drug to treat HIV when they had not gotten all-important safety data from the drug's trials.  *See* Testimony of Virginia Sheikh, Tr. Vol. 10, 51:2-21 (noting that the application was missing information about patients who had died during the trials or suffered other serious adverse events.)  The government incorporates by reference the PSR's sections on the history and characteristics of Defendant Kazempour.  *See* PSR at Part C, ECF No. 327.  The government specifically notes the defendant's education and qualifications to highlight that he had the ability to earn an honest living rather than defraud innocent investors.  However, the government also notes the defendant's age and medical

---

[10] *United States v. Berman*, 1:20-cr-00278 (D.D.C.) (biotech CEO who pled guilty on the eve of trial sentenced to 84 months); *United States v. Comu et al.*, 3:19-cr-00112 (N.D. Tex.) (beverage company CEO sentenced to 120 months for $12 million investment fraud scheme); *United States v. Jackson*, 22-cr-93 (D. HI.) (156 months for ship building company CEO convicted of $28 million investment fraud scheme).

history as weighing against lengthy incarceration.[11]  A sentence of 48 months imprisonment is appropriate given Defendant Kazempour's personal characteristics and the harm he caused.

### D. Fine

The United States Probation Office noted that both defendants have the ability to pay a fine.  *See* Pourhassan PSR at ¶108; Kazempour PSR at ¶112.  Both defendants were convicted of crimes for which the maximum fine is $5,000,000, meaning that the Court may impose a fine up to the statutory maximum.  *See* 15 U.S.C. § 78ff(a); U.S.S.G. §5E1.2(c)(4).

For Defendant Pourhassan, should the Court order full restitution it is unlikely he will be able to pay a fine.  Should the Court impose a lower amount of restitution, then a fine within the Guidelines range would be appropriate.

Defendant Kazempour's net worth comes from the proceeds he made from the sale of Amarex, which netted him approximately $80 million, and which has grown to $138 million after being invested.  PSR at ¶¶111-12.  CytoDyn was Amarex's largest customer, and from 2020 through 2021, CytoDyn paid Amarex more than $22 million.  *See* GX 401A, GX 907.  Given that Defendant Kazempour's participation in the fraud was motivated by doing Defendant Pourhassan's bidding to keep CytoDyn investor funds flowing into Amarex and ultimately his own pockets, *see* GX 167, the government recommends this court impose the alternative fine contemplated under the statute—twice the pecuniary gain—$685,500.  *See* 18 U.S.C. § 3571(d).

### III.    CONCLUSION

For the foregoing reasons, this Court should adopt the government's Guidelines calculations and impose the sentences of imprisonment, supervised release, fines, restitution, and forfeiture proposed above and in the government's related filings.

---

[11] The Bureau of Prisons confirmed that it is able to provide appropriate care for both defendants during any period of incarceration. Those letters have been filed as a sealed exhibit with the Court.

Respectfully submitted,

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division

By:    /s/ Vasanth Sridharan
       Vasanth Sridharan
       Senior Litigation Counsel

       Lauren Archer
       Matthew Reilly
       Trial Attorneys

       1400 New York Avenue, NW
       Washington, DC 20005
       Phone: (202) 549-1903
       Email: Vasanth.Sridharan@usdoj.gov

KELLY O. HAYES
United States Attorney

By:    /s/ Adeyemi Adenrele
       Adeyemi Adenrele
       Assistant United States Attorney
       United States Attorney's Office
       District of Maryland
       36 South Charles Street
       Baltimore, Maryland 21201
       Phone: (410) 209-4928
       Email: Adeyemi.Adenrele@usdoj.gov

21

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Counsel for Defendants Pourhassan and Kazempour.

Respectfully submitted,

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division

By:    /s/ Matthew Reilly
Vasanth Sridharan
Senior Litigation Counsel

Lauren Archer
Matthew Reilly
Trial Attorneys

1400 New York Avenue, NW
Washington, DC 20005
Phone: (202) 320-8523
Email: matthew.reilly2@usdoj.gov

KELLY O. HAYES
United States Attorney

By:    /s/ Adeyemi Adenrele
Adeyemi Adenrele
Assistant United States Attorney
United States Attorney's Office
District of Maryland
36 South Charles Street
Baltimore, Maryland 21201
Phone: (410) 209-4928
Email: Adeyemi.Adenrele@usdoj.gov